IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | | |
|---|---|---|---|
| CORRINDA SPAULDING | ) | | |
| | ) | | |
| Plaintiff, | ) | No. 08 C 2009 | |
| | ) | | |
| v. | ) | Hon. Michael T. Mason | |
| | ) | | |
| MICHAEL J. ASTRUE, | ) | | |
| Commissioner of Social Security | ) | | |
| | ) | | |
| Defendant. | ) | | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Presently before this Court is plaintiff Corrinda Spaulding's ("Spaulding" or "claimant") motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for disability insurance benefits under the Social Security Act (the "Act"), 42 U.S.C. §§ 416(i) and 423. The Commissioner filed a cross motion for summary judgment asking this Court to uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion for summary judgment is granted and the Commissioner's motion is denied.

## I.  PROCEDURAL HISTORY

Spaulding filed her application for disability insurance benefits on or around September 25, 1996, alleging a disability that precluded employment as of December 16, 1993. (R. 39-41). In a related document, claimant identified her disabling conditions as hiatal hernia, gastric reflux, chronic dyspepsia and erosive gastritis. (R.

47).  Claimant's date last insured was December 31, 1998.  (R. 23).   Accordingly, in order to receive benefits, claimant must be disabled under the Act as of that date.  42 U.S.C. § 423(c).

Claimant's application was denied administratively, and she filed a timely request for an administrative hearing.  (R. 17-27).  On March 3, 1998, claimant appeared with counsel for a hearing before ALJ James A. Horn ("ALJ Horn").  (R. 120-52).  On June 26, 1998, ALJ Horn issued a decision denying Spaulding's claim for benefits.  (R. 11-16).  Claimant filed a timely request for review.  (R.186).  The Appeals Council denied that request, and ALJ Horn's decision became the final decision of the Commissioner.  (R. 4).

Claimant then sought judicial review of ALJ Horn's decision.  The District Court for the Northern District of Illinois affirmed the ALJ, and Spaulding appealed to the Seventh Circuit Court of Appeals.  The Seventh Circuit reversed the lower court on March 28, 2001.  *Spaulding v. Halter*, No. 00-3738, 2001 U.S. App. LEXIS 5613, (7th Cir. March 28, 2001) ("*Spaulding I*").  The Seventh Circuit found that reversal was warranted because the ALJ committed factual errors and did not consider all of the relevant evidence, and remanded the case to the Social Security Administration for a new hearing.  *Spaulding I,* at **1, 9.

On November 4, 2002, claimant and her counsel again appeared before ALJ Horn.  (R. 297-334).  ALJ Horn issued a second decision denying Spaulding's request for benefits on April 25, 2003.  (R. 157-166).  Claimant again appealed.  In a decision dated May 12, 2004, the District Court remanded on the grounds that ALJ Horn failed to determine the severity and frequency of Spaulding's symptoms and related functional

limitations. *Spaulding v. Barnhart*, No. 03 C 4393, 2004 U.S. Dist. LEXIS 8637, (N.D. Ill. May 12, 2004) ("*Spaulding II*").

The Commissioner then vacated ALJ Horn's decision and appointed a new ALJ to hear Spaulding's case. (R. 416). On July 27, 2005, claimant appeared with counsel at a hearing before ALJ John K. Kraybill ("ALJ Kraybill"). (R. 357-92). At that time, ALJ Kraybill considered claimant's request for disability insurance benefits from December 16, 1993, her alleged onset date, through December 31, 1998, the date last insured, as well as an application for social security income ("SSI") benefits filed on April 27, 2004.

On September 16, 2005, ALJ Kraybill issued a decision denying Spaulding's claim for disability insurance benefits, and awarding her SSI as of April 27, 2004. (R. 339-47). The ALJ found that prior to April 2004, claimant could perform her past relevant work as a payroll clerk and film developer. (R. 345). Relying in part on the testimony of medical expert Dr. Carl Leigh ("ME Leigh"), ALJ Kraybill found that "from December 16, 1993, the date the claimant claims her disability began, until at least December 31, 1998, the claimant could do, at most, light work, or work involving lifting no more than 20 pounds at a time and 10 pounds occasionally, with the additional functional limitation of requiring 4 to 5 unscheduled bathroom breaks, during the workday." (R. 344). He found claimant's condition had "worsened" since April 2004 "such that she needed more numerous and longer restroom breaks." (*Id.*). Consistent with this finding, the ALJ determined that claimant was disabled under the Act since "at least April 27, 2004." (R. 347).

Spaulding appealed the denial of her claim for benefits from December 16, 1993 through December 31, 1998 to the District Court. At that time, the Commissioner

conceded that the ALJ failed to resolve all material factual issues related to Spaulding's claim, but opposed outright reversal of the decision and an award of benefits. The District Court allowed plaintiff to decide if she wished to "push ahead" with summary judgment, or if she preferred to accept the proposed remand. *Spaulding v. Astrue*, No. 05 C 6311, 2006 U.S. Dist. LEXIS 63407, *3 (N.D. Ill. July 14, 2006) ("*Spaulding III*"). Plaintiff elected to proceed with summary judgment. *Spaulding v. Astrue*, No. 05 C 6311, 2007 U.S. Dist. LEXIS 42118, *1 (N.D. Ill. March 2, 2007) ("*Spaulding IV*"). The Honorable James B. Moran ("Judge Moran") granted claimant's motion for summary judgment in part and remanded with instructions that the ALJ "specifically articulate his reasons for believing or not believing Spaulding's testimony as to her need for additional, extended, and unscheduled bathroom breaks." *Id.* at ** 2, 23. Judge Moran observed that "the crux of this disability determination appears to hinge on the number and length of bathroom breaks [claimant] would have needed in 1998," and directed the ALJ to consider all relevant evidence in the record. *Id.* at *25. The District Court explained that this "means assessing the previous testimony of plaintiff and medical and vocational experts, all of the medical records, evidence of plaintiff's symptoms, her diagnoses, and evidence of plaintiff's headaches and weakness that ensued after her episodes of vomiting and diarrhea." *Id.* Judge Moran held that "if the ALJ is unable to articulate specific reasons, drawn from the medical records and expert testimony, for any disbelief of [claimant's] testimony, he must award Spaulding the relief she requests." *Id.* at *24. The District Court also determined that "if [claimant] needed 4 or 5 or more unscheduled bathroom breaks lasting up to an hour or required more than 2 or 3 sick days per month, she would have been unemployable." *Id.*

4

Claimant appeared with counsel for another hearing before ALJ Kraybill on October 30, 2007. (R. 604-37). On February 8, 2008, the ALJ issued a decision denying claimant's request for disability insurance benefits for the period of December 16, 1993 to December 31, 1998. (R. 544-50). ALJ Kraybill determined that Spaulding was not disabled under the Act because the gastrointestinal disorders did not preclude performance of her past relevant work. (R. 549). The Appeals Council declined to assume jurisdiction over the ALJ's decision, and it became the final decision of the Commissioner. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Claimant then commenced the present action.

## II. FACTUAL BACKGROUND

### A. Medical Evidence

On March 30, 1988, Dr. Michael Colligan ("Dr. Colligan") examined Spaulding and diagnosed duodenitis with possible erosions and irritable bowel syndrome ("IBS"). (R. 108). At that time, Spaulding reported a two-year history of "symptoms of hyperacidity manifested by burning epigastric pain and nausea that is usually worse on an empty stomach," and episodes of alternating constipation and diarrhea. (*Id.*). Dr. Colligan prescribed Zantac on a trial basis. (*Id.*)

Spaulding returned to Dr. Colligan on April 28, 1992, complaining of "recurrent symptoms of postprandial nausea and vomiting, and attacks of constipation followed by bouts of diarrhea" over the past year. (R. 109). Claimant reported "several diarrheal stools over a 24-hour period, after which she restarts the cycle of constipation." (*Id.*). Dr. Colligan noted that claimant had gained 50 to 60 pounds, and "certain foods such as cheese and meat seem to cause the most symptoms." (*Id.*). The doctor opined that

5

Spaulding's "symptoms sound like a combination of IBS and gastroparesis," and recommended an upper gastrointestinal ("GI") exam. (*Id.*).

Spaulding returned for further treatment on July 21, 1992, complaining of recurrent nausea, vomiting, and dry heaves. (*Id.*). Claimant reported that her symptoms initially improved after starting Zantac and Reglan in May, but started flaring up again in the past week. (*Id.*). She had lost 18 pounds, part of which was "intentional" as claimant had been using Slim Fast for breakfast and lunch. (*Id.*).

The record includes the results of a "negative CT scan of [claimant's] abdomen" dated August 6, 1992. (R. 81). On August 7, 1992, and after reviewing the CT scan, Dr. Colligan performed an endoscopic examination. (R. 80). He observed a small hiatal hernia with increased secretions in the stomach, and again diagnosed erosive gastritis (*Id.*). Dr. Colligan continued Spaulding's medical therapy with H2 blockers, Reglan, Carafate and Zantac. (*Id.*). On September 2, 1992, Spaulding called the doctor's office to report that she was "feeling much better" and that the problem was "milk products." (R. 110).

On July 27, 1993, Dr. Eugene B. Loftin ("Dr. Loftin") noted that claimant "is taking antiinflammatory and muscle relaxant medications that may cause her to be inaccurate in handling money." (R. 89). Claimant returned to Dr. Loftin on December 7, 1993 and reported nausea, vomiting, and stomach pain "worse in AM." (R. 85) Dr. Loftin narrowed his diagnosis to either gastroesophageal reflux disease ("GERD") or pancreatic inflammation, prescribed Pepcid and Reglan, and ordered more tests. (*Id.*). On December 15, 1993, Spaulding called the doctor's office and requested a note for work because "they do not believe she is really sick." (*Id.*). Dr. Loftin wrote a note

6

stating that Spaulding was under his care for "severe stomach pain" but could "continue to work her usual job." (R. 86).

Spaulding missed her next two scheduled appointments with Dr. Loftin on December 21, 1993 and January 4, 1994. (R. 84). She received treatment from Dr. Loftin on May 16, 1995, at which time he prescribed Reglan and Zantac. (*Id.*). On June 4, 1996, Spaulding contacted Dr. Loftin's office to request a refill of her prescription. (*Id.*). When informed that she could not receive a refill without an examination, Spaulding became "very mad" and stated that she could not afford a visit because she and her husband were out of work. (*Id.*). The record does not show that Spaulding received a refill of her medication at that time, or that she received any further treatment from Dr. Loftin. (*Id.*).

Three months later, on July 17, 1996, Spaulding returned to Dr. Colligan. (R. 110). According to the doctor's notes, claimant stopped seeing him because of an unpaid balance owed to his office and a change of insurance coverage. (*Id.*). Dr. Colligan reviewed Spaulding's medical file and noted that her symptoms had "responded partially" to medications in the past, but they were not "completely effective because some of her symptomatology was due to non ulcer dyspepsia." (*Id.*). He also noted that "since [Spaulding] has been off work for the past three years she has felt as well as she ever has. She has lost 40 lbs. and kept it off. She is only having minimal dyspepsia, occasional episodes of nausea and dry heaves. Bowel pattern is normal." (*Id.*).

After Spaulding applied for disability insurance benefits, the Bureau of Disability Determination Services ("DDS") requested that Dr. Colligan complete a disability

evaluation form.  (R. 100).  In a form dated October 28, 1996, Dr. Colligan noted

claimant's current diagnoses of duodenitis and hiatal hernia.  (R. 100-01).  He indicated

that Spaulding had not lost weight and had no other impairments or conditions.  (*Id.*).

When asked to describe claimant's ability to perform a variety of work-related activities,

Dr. Colligan reported that "[e]mployment-related stress cause[d] G.I. symptoms to

become intolerable according to patient.  She should not bend over or lift objects

greater than 20 pounds because of hiatal hernia."  (R. 101).

On January 6, 1997, Dr. Colligan examined Spaulding and completed a general

medical report form at the request of the Social Security Administration.  (R. 96-99).  In

the physical findings section, Dr. Colligan reported a history of gastroesophageal reflux

and hiatal hernia for which claimant was taking Zantac and Reglan.  (R. 96-97).  The

doctor's physical exam revealed a "slight tenderness in the left costal margin area" of

claimant's abdomen and no palpable masses.  (*Id.*).  He recommended that claimant

"continue medical management of above conditions."  (*Id.*).  The record does not

include any evidence of claimant's treatment, if any, from January 1997 through

December 31, 1998, her date last insured.

On February 16, 1999, Spaulding received treatment from Dr. Loren B. White

("Dr. White") at Northwest Gastroenterologists.  (R. 259-62).  Dr. White diagnosed first

trimester pregnancy.  (R. 262).  He also noted claimant's history of GERD, hiatal hernia

and IBS.  (*Id.*).  Spaulding returned for further treatment on May 26, 1999 and reported

she was "still having reflux."  (R. 257).  Dr. White noted "no Tums - prenatal visit."  (*Id.*).

Spaulding canceled two follow-up appointments in 1999.  (R. 256).

On  September 28, 2000, Dr. White diagnosed claimant with esophagitis and

nausea with vomiting. (R. 255). He performed an esophagogastroduodenoscopy ("EGD") plus biopsy on October 2, 2000. (R. 267). During that exam, Dr. White noted a "mild degree of esophagitis with perhaps . . . several small erosions." (*Id.*). He determined that cardia of the stomach revealed granulation, induration and edema "consistent with a moderate esophagitis." (*Id.*). Dr. White opined that "these symptoms would be consistent with [claimant's] abdominal pain," and continued Spaulding's prescription for Zantac. (*Id.*).

On April 2, 2001, Spaulding complained to Dr. White of abdominal pain "lower abdominal in nature, usually preceding or related to a bowel movement." (R. 276). Claimant had been taking Prevacid which, according to the doctor, resulted in "significant improvement in her flux, though [it] has not entirely disappeared." (*Id.*). A November 21, 2001 upper gastrointestinal and small bowel study ordered by Dr. White did not reveal any abnormalities. (R. 287).

The record includes a July 8, 2002 note from Dr. White stating that claimant "is currently under [his] care . . . for [treatment] of gastritis and abdominal pain . . . [and] diarrhea which may require frequent trips to restroom." (R. 477). On August 5, 2002, Dr. White noted claimant's report of frequent bowel movements of five to eight per day, with occasional vomiting. (R. 476). Claimant returned for treatment on April 3, 2003, and Dr. White diagnosed GERD and IBS. (R. 475).

In a letter dated February 18, 2004, Dr. White reported Spaulding's continued complaints of "frequency of stools, perhaps as many as five to eight times per day" and nausea "followed by a headache of a pounding nature." (R. 472). The doctor noted that claimant "had mild tenderness in the left lower quadrant but had no other significant

positive findings." (*Id.*).  He also observed that claimant had lost twenty pounds in the past nine months.  (*Id.*).  Dr. White continued claimant's prescription for Prevacid and Reglan for "gastroesophageal reflux disease accompanied by nausea," and recommended that claimant see a neurologist to determine if her nausea was related to a "migraine-type prodrome."  (*Id.*).

On December 14, 2004, Dr. White drafted a letter to claimant regarding "Residual Physical Functional Capacity Assessment."  (R. 455-56).  In that letter, Dr. White stated that he has treated claimant since February 1999 for problems related to the gastrointestinal tract.  (R. 455).  He noted that claimant's "symptoms at this time include nausea without vomiting on a daily basis," and she has "diarrhea accompanied with cramping five to eight times per day."  (*Id.*).  Dr. White opined that "with respect to possible disability relating to this illness, chronic, severe, diarrhea-predominant irritable bowel syndrome, Mrs. Spaulding should indeed be allowed to have frequent bathroom privileges."  (R. 456).  Dr. White stated "her diarrheal stools may certainly interrupt her day, which will result in cramping and impairment in her normal work activities."  (*Id.*).  Claimant visited Dr. White again on January 12, 2005 and received a "normal" diagnosis regarding her rectum, sigmold colon, descending colon, splenic flexure, transverse colon, hepatice flexure, ascending colon, cecum and ileocecal valve.  (R. 460).

**B.  Claimant's Testimony**

Spaulding appeared with counsel and testified before ALJ Horn at the 1998 administrative hearing.  (R. 125-53).   At that time, Spaulding lived with her eleven-year-old daughter.  (R. 126).  She was last employed as a bank teller in December of 1993.  (R. 127, 136).  According to claimant, she was fired because the bank was "tired" of her

"not being able to come in and . . . basically didn't believe that [she] really was ill."  (R. 136).  Spaulding explained that her symptoms included "vomiting" and she "would have to go home because [she] couldn't wait on customers."  (R. 137).  Claimant tried to change her work duties and schedule to see if that would improve her condition, but "nothing seemed to work."  (R. 141).

When asked about her (then) current symptoms, claimant explained that she still vomits and has "bad days" but "on a constant basis from month to month . . . [her] whole system has calmed down."  (R. 139).  She stated that sometimes her vomiting is "out of control" and she'll throw up in bed.  (*Id.*).  Spaulding described her nausea as "pretty much there all the time."  (R. 147).  Claimant's bowels "are very much affected," and she has trouble with diarrhea and constipation.  (R. 145).  Sometimes the diarrhea is "so bad" that claimant has to sleep because she's "so weak . . . disoriented . . . really dizzy . . . [and] lightheaded."  (R. 146).  Claimant further testified about her abdominal pain which "feels like a heart attack sometimes."  (R. 147).  She stated that she smokes anywhere from a half a pack to a pack of cigarettes a day.  (R. 133).

Spaulding also testified in front of ALJ Horn at the 2002 hearing.  (R. 304-12).  Spaulding stated that her symptoms had "gotten worse" since the last hearing.  (R. 306).  At that time, claimant also suffered from depression and hormonal irregularity.  (R. 308).  Spaulding explained that she had not looked for a job since the prior hearing because she "tried very hard to keep a job before, and . . . just . . . can't do it."  (R. 306).  Claimant described her prior work experience as "very debilitating and humiliating" and stated that she's "only gotten worse since then."  (*Id.*).  When asked to elaborate, claimant described her "symptoms daily" of "[b]eing in the bathroom, and being

11

re[pri]manded for [her] tardiness and [her] absenteeism, and being fired because [she] couldn't be reliable."  (R. 307).  Claimant stated that vomiting, diarrhea and nausea caused her to take frequent breaks from her work duties.  (*Id.*).  She recalled "not being able to wait on customers because [her] nausea would be so bad" and having to excuse herself "several times throughout the day to go to the restroom"  (*Id.*).  Spaulding believed these problems would "most definitely" continue as she's "very sick."  (*Id.*).

Spaulding testified at the 2005 hearing held before ALJ Kraybill.  (R. 357-72).  At that time, claimant lived with her children, age five and eighteen.  (R. 357-58).  She "needed a lot of help" when her youngest child was an infant.  (R. 360).  When claimant had "an episode [she'd] just take him and everything to the bathroom."  (*Id.*).  Claimant reported that her diarrhea attacks had "gotten worse" over the last seven years.  (R. 361).  These episodes would last "10 minutes to 30 minutes to an hour."  (R. 366).  Spaulding stated that her biggest fear is that she "can't find a restroom" and "will go in [her] pants."  (*Id.*).  Spaulding complained of nausea "[p]retty much every day" and headaches that sometimes get "so intense" that she vomits.  (*Id.*).  Claimant's vomiting episodes occur "maybe once or twice a week" and last "20 to 30 minutes."  (R. 367).  Spaulding feels "weak, disorientated, light headed, [and] very sore" after a vomiting episode.  (*Id.*).  As of July 2005, claimant needed to use the restroom five to eight times on a good day and twelve to fifteen times on a bad day.  (R. 361).

Spaulding again testified in front of ALJ Kraybill at the 2007 administrative hearing.  (R. 608 - 37).  Claimant recalled that back in 1998, on a "good day" she used the bathroom three to eight times a day, depending on her symptoms of nausea, vomiting or diarrhea.  (R. 615).  On a "bad day" she used the bathroom "a dozen times

to maybe more, varying from 10 minutes to 30 minutes, sometimes longer." (*Id.*).  In 1993, Spaulding had more "bad days" because she was working.  (R. 618-19).  During that time, claimant wore undergarments for leakage protection. (R. 616).  She stated that she has "always had nausea."  (R. 617).  Claimant explained that "over the years" her "projectile vomiting . . . seemed to have gotten less and [her] diarrhea more."  (R. 618).

Spaulding took Slim Fast and Ensure for nutritional purposes.  (R. 610).  Claimant went into premature labor in 1999.  (R. 611).  According to Spaulding "it could have been induced by the vomiting, the violent vomiting and then about four weeks later, I had him early."  (R. 611).  Spaulding did not take any medication during her pregnancy, besides pre-natal vitamins.  (R. 612).  She saw only her gynecologist, Dr. Matthew, during the pregnancy because Dr. White's office told her there was nothing they could give her "that wouldn't interfere with the fetus."  (R. 612).

### C.    Medical Expert's Testimony

#### 1.    Medical Expert Walter J. Miller

Walter J. Miller ("ME Miller") testified as a medical expert at the 2002 hearing.  (R. 313-25).  ME Miller opined that claimant did not have any listed impairment.  (R. 314).  He observed that "nothing approaches" any of the listed impairments for the digestive system, which he identified as categories 501 through 508, digestive gastrointestinal.  (R. 313).  The ME also noted that claimant's record includes "extensive testing by specialists. . . . [a]nd the most it's shown is gastric erosion, duodenal erosions.  Nothing more."  (*Id.*).  ME Miller observed that claimant has "been clearly checked for extensive disease of her esophagus, or her stomach, or her duodenum, or

small bowel and for her colon" and these tests "have not shown any evidence of diseases which are diagnosable or treatable." (R. 315). The ME noted that claimant's medication has not relieved her symptoms, and she "continues to have her symptoms . . . whether she takes [medication] or not." (*Id*). He opined that claimant's symptoms persisted "without any basis, anatomical, pathological basis." (R. 314). ME Miller concluded that claimant has "received symptomatic treatment all these years without any actual physical pathological diagnosis." (*Id.*).

ME Miller noted evidence of an anxiety disorder sometime in 2000. (R. 314-15). When asked about claimant's possible need to avoid the ordinary stresses found in the workplace, the ME noted that the "lack of diagnosis in the record makes it hard to evaluate what's wrong with her." (R. 319). ME Miller also noted that claimant's "symptoms caused her to not remain in one position a long time, but it's hard to substantiate exactly why." (*Id.*). Thus, the ME concluded that the record doesn't support that restriction. (*Id.*). ME Miller found that the record did not provide any explanation for claimant's frequent bathroom breaks. (*Id.*). "[S]he testified that she has to run to the bathroom frequently. But the record doesn't indicate the diagnosis for which she has to do that." (*Id.*). The ME opined that claimant would have no restrictions on stooping, kneeling, or crouching. (R. 317). He discounted Dr. Colligan's note regarding Spaulding's inability to bend over because there was "no diagnosis in the records to substantiate that." (R. 318).

### 2. Medical Expert Carl G. Leigh

Carl G. Leigh ("ME Leigh") testified as a medical expert at the 2005 hearing. (R. 372-80, 385-86). ME Leigh stated that the record contained sufficient objective medical

evidence to allow him to form an opinion as to claimant's medical status from December 1998, the date last insured, through the hearing date. (R. 375). When asked to describe claimant's impairments, ME Leigh noted a diagnosis of "erosive gastritis," as well as "duodenitis, irritable bowel syndrome, which is also called spastic colon and is a variation of what would be called inflammatory bowel disease." (*Id.*). He also noted the presence of a bacteria called hilabactorbilori in 2002, "gastroparesis" or a spastic stomach, hiatal hernia, and gastro-esophageal reflux disease. (R. 375-76). ME Leigh opined that claimant's impairments did not meet or equal any listing. (R. 376).

The ALJ asked ME Leigh to offer an opinion on an appropriate Residual Functional Capacity ("RFC") for Spaulding. (R. 377). ME Leigh responded that "for the period in question, December 1993 to December 1998, the claimant would be restricted to a light RFC, namely lifting and carrying occasionally 20 pounds, frequently 10 pounds; standing and walking six out of an eight hour day." (*Id.*). ME Leigh further opined that "the only additional restriction would be that she have access to a toilet. More than at lunch time and a morning and afternoon break." (R. 377).

ME Leigh observed that the evidence for the years 1993 to 1998 is "not nearly as complete and as helpful" as evidence from 2004. (R. 377). Based on his review of the record, ME Leigh concluded that claimant's condition was "more severe" by August 2004. (*Id.*). He opined that "it would not be unreasonable" to back the date up from August to April 2004. (*Id.*). In so concluding, ME Leigh relied on Dr. Colligan's finding that claimant should not bend over or lift objects greater than 20 pounds because of the hiatal hernia, as well as claimant's report that she had been told to elevate the bed posts and avoid tight garments. (R. 378, 363). The ME found a "more restrictive RFC"

15

as of April 2004 at a "sedentary level with the same restrictions that she would need access to a toilet and this would be even more frequent access." (R. 377). ME Leigh opined that claimant's testimony regarding her need to take extended bathroom breaks was not inconsistent with the medical evidence. (R. 379). When asked to opine on the frequency or length of claimant's bathroom breaks during the 1993 to 1998 time period, ME Leigh responded "a total of four to five times during an eight hour work day." (R. 385-86).

### 3. Medical Expert Ashok Jilhewar

Ashok Jilhewar ("ME Jilhewar"), a board certified gastroenterologist, testified as a medical expert at the 2007 hearing. (R. 619-32). ALJ Kraybill reminded the ME that this case had been remanded to make a determination regarding "the difficulty [claimant] was encountering requiring bathroom breaks" as of December 1998 and for a "finding as to the number, the frequency and the length of the bathroom breaks." (R. 620). ME Jilhewar responded that the "documentation is not there." (*Id.*). The ME explained that with frequent bowel movements, nausea and vomiting, he would expect a low serum potassium level and possibly a low serum albumin level. (*Id.*). The ME observed that there was "nothing [in the record] near the date last insured of December 31, 1998." (*Id.*). ME Jilhewar noted an "absolutely normal" laboratory test from June 14, 1995, with normal levels of serum potassium, serum albumin and nutrition. (*Id.*). He observed that claimant's medical history did not include "a single medication which is usually for diarrhea." (R. 621). The ME also observed that claimant's treating physicians did not prescribe any medication to treat her nausea, even though Zofran can be given during pregnancy. (R. 622)

16

ME Jilhewar found it "difficult" to determine claimant's status in 1998 due to the "absence of lab data and treatment supporting the testimony." (R. 622). The ME concluded that claimant suffered from IBS in 1998 as it was "diagnosed by her treating doctor." (*Id.*). However, he did not "find the documentation . . . to explain the severity of the symptoms [identified in the] testimony of the claimant." (*Id.*). The ME opined that Spaulding "did not pursue the medications for a so-called intractable diarrhea and intractable abdominal pain if she indeed had it." (R. 629). He could not diagnose malnutrition due to the "absence of objective finding." (R. 622). ME Jilhewar did not credit the suggestion that claimant took Slim Fast as a nutritional supplement. (R. 623).

Based on the record, ME Jilhewar opined that claimant did not have an impairment or combination of impairments that met or equaled any listing as of December 31, 1998. (R. 623). He opined that "most of the time" one can "manage the bowel movement" around regular breaks. (*Id.*). ME Jilhewar found no medical documentation of frequent incontinence that would support claimant's statements regarding her need to wear Depends. (*Id.*). The ME clarified that he was "not saying that she did not or does not have it," but "didn't see the need for wearing the pad at all from the documentation." (*Id.*). He further determined that as of December 31, 1998, Spaulding would be restricted to light work, lifting 20 pounds regularly and 10 pounds frequently, with no additional restrictions. (R. 624).

### D. Vocational Expert's Testimony

#### 1. Vocational Expert James Breen

James Breen ("VE Breen") testified as a vocational expert at the 2002 and 2005 hearings. (R. 325-34, 380-84, 386-92). In 2002, VE Breen observed that "[m]ost

employers would not allow somebody to miss more than two to three days a month."
(R. 330).  When asked if an employee could take one 30-minute unscheduled break
three days a week, VE Breen replied "[i]t's been my experience that employers won't
allow for that."  (R. 332).

At the 2005 hearing, VE Breen testified that an employer would generally not
allow four to five additional breaks throughout a day.  (R. 386).  He explained that "four
breaks throughout a day is unheard of because you're going to get a morning break . . .
your lunch break and an afternoon break."  (*Id.*).  The VE opined that "[o]ne extra break
a day isn't going to make somebody unemployable."  (*Id.*).

### 2.  Vocational Expert Glee Ann Kehr

Vocational Expert Glee Ann Kehr ("VE Kehr") testified at the 2007 hearing.  (R.
604-37).  The VE classified claimant's past job as a bank teller as light, "semiskilled not
transferable down to sedentary."  (R. 633).  She noted that claimant's other past jobs
are classified as "sedentary, low end semiskilled."  (*Id.*).  VE Kehr stated that a "general
rule of thumb" is that in a non-manufacturing workplace, an employee needs to be on
task approximately 85 percent of the work time in order to sustain employment.  (R.
634).  She opined that unscheduled breaks may be acceptable in some settings, but not
breaks of thirty minutes.  (R. 634-35).   "[I]f somebody has got to be off task and not
working, taking a bathroom break for 30 minutes at a time, ultimately, they would not be
able to sustain employment."  (R. 635).  VE Kehr testified that generally "an individual
would work for two hours, have a 15-minute break, work for two more hours, a
30-minute lunch, two more hours, then another 15-minute break and then two hours,
they would go home."  (R. 636).  VE Kehr opined that an employer would not allow an

employee to take more than one unscheduled 30 minute break per day.  (*Id.*).

## III.    LEGAL STANDARD

### A.    Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g);  *Steele v. Barnhart,* 290 F.3d 963, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55. F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971)).  We must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner.*" Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).  Rather, this Court must "conduct a critical review of the evidence" and not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.*  Under the governing case law, an ALJ is not required to discuss every piece of evidence in the record, but must provide "some glimpse" into his reasoning. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  "Where an ALJ denies benefits, [he] must build an accurate and logical bridge from the evidence to [his] conclusion." *Id.*; *see also Carlson v Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (reasoning that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence and enables us to trace the path of the ALJ's reasoning.") (quotations omitted).  If the ALJ's decision lacks an adequate discussion of the issues, it will be remanded.  *Villano v. Astrue*, 556 F.3d 558,

562 (7th Cir. 2009).

### B.    Analysis Under the Social Security Act

To receive disability insurance benefits, a claimant must be "disabled" under the Social Security Act.  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  To determine if a claimant is disabled, the ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy.  *Dixon*, 270 F.3d at 1176 (citing 20 C.F.R. § 404.1520).  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

ALJ Kraybill followed the first four steps, but did not make an explicit finding at step five.  At step one, ALJ Kraybill determined that claimant had not engaged in substantial gainful activity since the alleged onset of her disability.  (R. 549).  The ALJ found, at step two, that claimant's gastrointestinal impairments were severe.  (*Id.*).  Next, at step three, ALJ Kraybill determined that Spaulding did not have an impairment

or combination of impairments that met or medically equaled any listing set forth in Appendix 1, Subpart P, Regulations No. 4. (*Id.*). He found claimant's testimony regarding her symptoms, pain and functional limitations was not credible based on the objective medical evidence. (*Id.*). The ALJ also found that claimant had the RFC to perform a full range of light work activity. (*Id.*). ALJ Kraybill then determined, at step four, that claimant could perform her past work as a bank teller or payroll clerk. (*Id.*). The ALJ did not discuss claimant's ability to perform other jobs in the national economy. He concluded that claimant was not disabled under the Act.

Claimant argues that benefits must be awarded because ALJ Kraybill did not follow the District Court's Order. *See Spaulding IV* at *25 (stating that a failure to comply with the instructions on remand "will lead to the grant of plaintiff's benefits"). Specifically, Spaulding contends that the ALJ did not consider contrary evidence in the record, including the opinions of her treating physicians, the medical experts and the vocational expert, as well as claimant's testimony regarding her bathroom use, weakness, and irritable bowel syndrome. Claimant also asserts that the ALJ failed to make a well reasoned and proper credibility determination. Finally, claimant argues that the ALJ's step four determination is erroneous because he did not consider her prior work history. We begin with claimant's arguments regarding the ALJ's compliance with the District Court's prior Order.

IV. **LEGAL ANALYSIS**

   A. **The ALJ Must Sufficiently Articulate His Finding Regarding the Frequency and Duration of Claimant's Required Bathroom Breaks**

Claimant challenges the ALJ's failure to make an explicit finding regarding the

frequency and duration of her bathroom breaks.  The government concedes that the

ALJ "might not have made an explicit finding regarding [Spaulding's] need to use the

bathroom in 1998," but argues that he "obviously discredited her testimony in this regard

since he concluded that she could perform the full range of light work."   While the

government's argument is feasible, this Court will not engage in such speculation.  *See,

e.g., Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (noting that the court may not

make independent credibility determinations).

It is apparent that ALJ Kraybill was aware of the District Court's instructions on

remand.  He specifically questioned ME Jilhewar about the "frequency and the length of

the bathroom breaks that could be expected."  (R. 620).  The ME responded that the

"documentation is not there" and proceeded to speak to claimant's frequent bowel

movements, nausea and vomiting.  (*Id.*).  ALJ Kraybill did not follow up on his question

regarding claimant's required bathroom breaks.  Further, he did not incorporate ME

Jilhewar's comment regarding the absence of supporting documentation for the alleged

bathroom breaks into his ruling.  Even more troubling, the ALJ did not address

claimant's testimony that in 1998 she used the bathroom from three to twelve times a

day, sometimes for more then thirty minutes at a time.  (R. 615).  Because the ALJ did

not articulate his findings in a manner that allows for meaningful review, remand is

necessary.  *See Steele*, 290 F.3d at 940 (reasoning that "where the Commissioner's

decision lacks evidentiary support or is so poorly articulated as to prevent meaningful

review, the case must be remanded.").  On remand, the ALJ must articulate his reasons

for disbelieving claimant's testimony regarding the frequency and duration of her

bathroom breaks.

This Court also notes that the record includes at least some medical evidence, specifically Dr. White's opinion, regarding claimant's frequent bathroom use. (R. 456). On remand, the ALJ must "minimally articulate" his reasons for rejecting this evidence. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).

## B.     Remand is the Appropriate Remedy

Spaulding contends that the ALJ's failure to articulate his findings regarding the frequency and duration of claimant's required bathroom breaks mandates an award of benefits. We disagree.

Claimant's argument hinges on the District Court's observation that "failure to provide a full and fair credibility determination and assessment of the entire case record will lead to the grant of plaintiff's benefits." *Spaulding IV*, 2007 U.S. Dist. LEXIS 42118 at * 25 (citing *Spaulding III*, 2006 U.S. LEXIS 63407 at * 3 ("Perhaps at some point the agency abdicates its authority to make the determination and surrenders that authority to the court.")). We are troubled by the ALJ's failure to follow the District Court's instructions on remand, and by the longstanding nature of this case. However, that failure does not, in itself, allow for an award of benefits. As Judge Moran recognized, "delay and administrative obduracy is insufficient in itself to allow us to award plaintiff benefits." *Id.* at *19 (citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d. 345, 357 (7th Cir. 2005)).

The evidence before this Court allows for potentially conflicting conclusions. Claimant relies heavily on her own testimony to establish the frequency and duration of her bathroom breaks. Although ALJ Kraybill did not rely on this testimony in his decision, this Court recognizes that ME Miller addressed this issue at the 2002 hearing

23

and reached an alternative conclusion.  Other medical evidence may contradict the

claimant's testimony.  The Seventh Circuit has cautioned the district courts not to

"reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our

judgment for that of the Commissioner."  *Lopez*, 336 F.3d at 539 (quotation omitted).

Consistent with that mandate, where the ALJ's decision is not supported by substantial

evidence or otherwise contrary to the governing regulations, "[t]his Court must remand

unless the evidence compels an award of benefits."  *Nolan v. Astrue*, 2010 U.S. Dist.

LEXIS 3836, *2 (C.D. Ill. Jan. 19, 2010) (citing *Briscoe*, 425 F.3d. at 355); *see also*

*Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993) (remanding where the required

determination is "essentially a factual finding" unless "the record can yield but one

supportable conclusion.").  Claimant has not shown that the only reasonable conclusion

is to find her disabled under the Act.  Accordingly, claimant's request for an award of

"the disability insurance benefits that she is justly due" is denied.  *See Binion ex rel.*

*Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997) ("Where conflicting evidence allows

reasonable minds to differ as to whether a claimant is entitled to benefits, the

responsibility for that decision falls on the Commissioner.").

**C.      The Remainder of ALJ Kraybill's Credibility Analysis Is Not Patently
          Wrong**

Claimant contends that ALJ Kraybill did not make a well-reasoned and proper

credibility determination.  *See* 20 C.F.R § 404.1529(c) (obligating the ALJ to "consider

all available evidence" and evaluate "the intensity and persistence" of claimant's

symptoms in order to determine how those symptoms limit the capacity for work).  To

succeed on this claim, claimant must overcome the highly deferential standard that we

accord credibility determinations.  *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.

2000) (holding that the credibility determinations of hearing officers are afforded special

deference).  Because the ALJ is in a superior position to assess the credibility of a

witness, this Court will sustain the ALJ's credibility determination unless it is "patently

wrong" and not supported by the record.  *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir.

2007).

ALJ Kraybill  found that "claimant's testimony concerning [the] frequency of

diarrhea and vomiting attacks does not match the medical evidence of record and her

prescription medications over the years do not match her symptoms or testimony."  (R.

548).  Claimant argues that this determination is "inconsistent with the objective medical

evidence" and therefore does not comply with the governing regulations and Social

Security Ruling ("S.S.R.") 96-7p.  Under that ruling, "the ALJ's assessment of the

credibility of an individual's statements about pain or other symptoms and about the

effect the symptoms have on her ability to function must be based on a consideration of

all the evidence in the case record."  S.S.R. 96-7p.  Spaulding contends that the ALJ's

determination cannot stand because "he did not find that [she] has irritable bowel

syndrome" even though Dr. Colligan diagnosed that condition as early as March 1988.

(R. 108).  Claimant states, in her reply brief, that this is a "significant omission because

irritable bowel syndrome is the most common cause of chronic diarrhea."  Thus,

claimant argues that "[h]ad the ALJ recognized the diagnosis of [IBS] . . .  he would

have been required to grapple with the conflict between the treating physician's

diagnoses of IBS and [ME] Jilhewar's contrary opinion."

This Court is not convinced by claimant's argument.  Both ALJ Kraybill and ME

Jilhewar recognized that claimant suffered from IBS.  (R. 547, 622).  The ALJ rejected the claimant's contention that she is among the "small percentage of people with irritable bowel syndrome who have severe signs and symptoms" due to the absence of collaborating medical evidence.  (R. 547).  Claimant has not cited any medical opinion that contradicts this finding.   Accordingly, we cannot say that this determination is patently wrong.  *But see Myles v. Astrue,* 582 F.3d 672, 676 (7th Cir. 2009) (remanding for the ALJ to reconsider his credibility determination where the ALJ "overlooked two complaints to doctors when he asserted that [claimant] had not complained of urinary frequency.").

Next, Spaulding contends that the credibility determination cannot stand because it is based only on the absence of supporting medical evidence.  Claimant argues that "one of the cardinal principles of credibility determinations . . . is that a non-credibility finding cannot be based solely on an ALJ finding that a claimant's testimony is not substantiated by the objective medical evidence."  In support, claimant relies on *Indoranto v. Barnhart,* 374 F.3d 470 (7th Cir. 2004).  In that case, the ALJ did not credit claimant's testimony that she took up to three hot baths a day to alleviate her pain and muscle spasms.  *Id.* at 474.  The Seventh Circuit found that the ALJ erred in his credibility determination because the record was "replete" with evidence of the "severe pain [claimant] was suffering as a result of herniated discs," including instructions from her physical therapist to take 30-minute hot baths for pain relief.  *Id.*  These facts are not present here.

ALJ Kraybill relied on specific evidence to support his credibility determination.  *See* 20 C.F.R. § 404.1529(c)(2) (explaining that an ALJ will not reject a claimant's

26

statements about "the intensity and persistence of [her] pain or other symptoms or about the effect of [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [claimant's] statements."). For example, ALJ Kraybill's observation that claimant's "prescription medications over the years do not match her symptoms or testimony" is supported by the ME's testimony. (R. 548, 621-23). As the ALJ recognized, ME Jilhewar found that claimant did not receive medication for diarrhea or nausea, even though she testified to frequent vomiting and diarrhea as well as dehydration and malnutrition. (R. 547). The ALJ also relied on claimant's admission that she "has not been hospitalized and did not require emergency room treatment," a finding that is consistent with the medical record. (R. 548). Because the ALJ provided specific reasons for his findings and his analysis is supported by substantial evidence, the credibility determination should be upheld. *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009) (citation omitted).

However, because we have already found that remand is warranted, we also remand on this point. The ALJ should further articulate his findings, keeping in mind his obligation to "look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received, . . . medications taken, and functional limitations." *Simila v. Astrue,* 573 F.3d 503, 517 (7th Cir. 2009) (quotations omitted). In particular, the ALJ should address claimant's statements regarding any limitations of her daily activities allegedly caused by her chronic diarrhea.

### D.    The RFC Determination

Next, claimant argues that the ALJ erred by failing to consider ME Leigh's

opinion that from 1993 to 1998 claimant's medical condition required that she have "access to a toilet" outside of the usual break times in connection with his RFC determination.  (R. 377).  In his decision issued on September 16, 2005, the ALJ adopted ME Leigh's "additional functional limitation of requiring . . . 4-5 unscheduled bathroom breaks during the workday."  (R. 344).  However, ALJ Kraybill's most recent opinion does not include any restrictions due to the number of bathroom breaks. Spaulding persuasively argues that ALJ Kraybill should have explained his reasons for revising his prior RFC determination.  On remand, the ALJ must explain why he no longer credits ME Leigh's opinion.

Claimant also challenges the ALJ's failure to consider Dr. Colligan's opinion, made in 1996, that claimant should not bend or lift objects over twenty pounds.  (R. 101).  The Government posits that the ALJ "could have declined to give this opinion any significant weight because it was not well supported."  It further argues that ME Jilhewar's assessment "contradicts Dr. Colligan's opinion that [Spaulding] was unable to bend."  This argument is predicated on ALJ Kraybill's observation that ME Jilhewar found claimant could perform "light work with no additional restrictions and her impairments would not impact bending."  (R. 548).  However, ME Jilhewar did not make any explicit findings regarding claimant's ability to bend.  Rather, he testified that claimant would be restricted to light work and "should be able to stand six hours in an eight-hour work day" and sit "indefinite," and had "no manipulative limitations."  (R. 624).

The government further argues that "[c]onsidering the lack of significant objective findings, the ALJ could reasonably conclude that. . . . Dr. Colligan's opinion was based upon [Spaulding's] complaints, and appropriately decline to grant it any significant

weight." *See Dixon*, 270 F.3d at 1178 (holding that an ALJ may reject a doctor's opinion "if it appears to be based on a claimant's exaggerated subjective allegations.") (citation omitted). Had the ALJ expressly found that Dr. Colligan's opinion was based on claimant's own statement, or that it is entitled to little weight due to an abundance of conflicting evidence, we would be inclined to credit that determination. However, in the absence of any specific finding, we cannot speculate as to the ALJ's reasoning. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) (holding that "general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). On remand, the ALJ must articulate his reasons for giving little weight to Dr. Colligan's opinion.

The claimant also contends that the ALJ did not consider her prior work history, and did not compare her RFC to the specific duties required by her past jobs. We need not reach these arguments. Having remanded for further consideration of claimant's RFC, we also instruct the ALJ to reconsider his findings at step four and, if necessary, make a determination as to claimant's ability to perform other jobs in the national economy.

### E.    The ALJ Must Consider the Side Effects of Claimant's Medication

We are also persuaded by claimant's statements that the ALJ considered only four of her prescription medications, and did not consider the side effects of Reglan. On remand, the ALJ should consider all of claimant's medications and their side effects, including ME Jilhewar's testimony that Reglan would "make the diarrhea worse." (R.

630).

## V.     CONCLUSION

For the reasons set forth above, claimant's motion for summary judgment is granted in part and the Commissioner's motion for summary judgment is denied.  The case is remanded to the Social Security Administration for further proceedings consistent with this opinion.  It is so ordered.

**ENTERED:**

_Michael T. Mason_

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: March 22, 2010**